

U.S. DISTRICT COURT
DISTRICT OF N.H.
FILED

2015 JAN 26  P 3: 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

Plaintiff
Lorettann Gascard, Pro Se
348 Rte. 202
Rindge NH 03461
(603) 899-5405

vs.

Defendants
Franklin Pierce University, et al

Dr. Kim Mooney,
Franklin Pierce University

Dr. Kerry McKeever
Franklin Pierce University

Dr. Paul Kotila,
Franklin Pierce University

Ms. Janette Merideth,
Franklin Pierce University

COMPLAINT

DEMAND FOR JURY

1

## PARTIES, JURISDICTION AND VENUE

1. The plaintiff, Lorettann Gascard, resides at 348 Route 202, Rindge, New Hampshire, and is 66 years old.

2. The defendant, Franklin Pierce University, is a New Hampshire corporation, having its principal office and place of business at 40 University Drive, Rindge, New Hampshire. The defendant is engaged in business as a University.

3. The defendant, Dr. Kim Mooney, is  Provost of Franklin Pierce University at 40 University Drive, Rindge, New Hampshire.

4. The defendant, Dr. Kerry McKeever, is Dean of the College at 40 University Drive, Rindge, New Hampshire.

5. The defendant, Dr. Paul Kotila, Former Dean of the College at Rindge, (Presently Professor of Natural Sciences at 4 University Drive, Rindge, New Hampshire.

6. The defendant, Ms. Janette Merideth, is Director of Human Resources of Franklin Pierce University at 40 University Drive, Rindge, New Hampshire.

7. Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 451, 1331, 1337, 1343, and 1345. This action is authorized and instituted pursuant to Section 107(a) of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C.A. § 12117(a), which incorporates by reference Sections 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.A. §§ 2000e-5 (f)(1) and (3), and pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C.A. § 1981(A).

8. Jurisdiction of this Court is invoked under Section 7(b) of the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. § 626(b), and Section 16(b) of the Fair Labor

Standards Act, 29 U.S.C.A. § 216(b), FMLA 29 U.S.C. § 2614(1)(A)-(B); 29 U.S.C. § 2615(a)(2). This Court has jurisdiction under Section 7(b) of the ADEA, 28 U.S.C.A. § 1337, and 29 U.S.C.A. § 626(b).

9. Jurisdiction is based on Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-16 (1964). On February 13, 2013, Lorettann Gascard filed a complaint of discrimination based on disability against the Franklin Pierce University and the above-named supervisors with the Equal Employment Opportunity Commission ("EEOC") of the Franklin Pierce University. On May 8, 2013, Lorettann Gascard amended her complaint of discrimination against the Franklin Pierce University and the above-named supervisors with the Equal Employment Opportunity Commission ("EEOC") of the Franklin Pierce University to include discrimination based on age, sex and retaliation. A Notice of Right to Sue (issued on request) was released by the EEOC on February 24, 2014. She is therefore exercising her rights under the statute to file suit in federal district court. 42 U.S.C.A. § 2000e-16.

10. At all times relevant to this Complaint, the defendant was engaged in an industry affecting commerce as defined in Section 11(h) of the ADEA, 29 U.S.C.A. § 630(h).

11. At all times since 1962, the defendant has employed 20 or more employees for each working day in each of 20 or more calendar weeks in the preceding calendar year. The defendant was and is, therefore, an employer within the meaning of Section 11(b) of the ADEA, 29 U.S.C.A. § 630(b).

12. Venue is proper in this district because employment records relevant to this action are located at the Franklin Pierce University's principal place of business in Rindge, New Hampshire, and because the defendant's failure to stop the unlawful age, gender and

3

disability discrimination subjected Lorettann Gascard and others to a hostile work environment. 42 U.S.C.A. § 2000e-5(f)(3).

13. The employment practices hereafter alleged to be unlawful were and are now being committed in the State of New Hampshire.


## COUNT I.


14. The allegations of paragraphs 1 through 13 of this Complaint are incorporated by reference into this paragraph 14.

15. On February 13, 2013, the plaintiff filed a charge ("Charge") with the Equal Employment Opportunity Commission ("EEOC") charging the defendant with discriminating against the plaintiff on the basis of disability.

16. On May 8, 2013, the plaintiff amended the charges ("Charges") with the Equal Employment Opportunity Commission ("EEOC") charging the defendant with discriminating against the plaintiff on the basis of age, sex, retaliation and disability.

17. The plaintiff is informed and believes that the EEOC sent a notice of the Charge to the defendant and that the defendant received the notice.

18. More than 60 days have elapsed since the plaintiff filed the Charge.

19. The EEOC, the plaintiff, and a representative of the defendant participated in conciliation of the Charge without reaching agreement.

20. The EEOC has not filed suit concerning the matters described in the Charge.

21. A Notice of Right to Sue (issued on request) was released by the EEOC on February 24, 2014.

22. The plaintiff originally requested accommodations under the Americans with Disabilities Act in March 2012 and August 2012.

23. On December 3, 2012, the plaintiff, furnished the Chair of the Visual and Performing Arts Division, Phyllis Zrzavy (the plaintiff's immediate supervisor) with her physician's note, dated November 11, 2012, stating that because of stress related factors she (the physician) "must restrict her (the plaintiff) from meeting attendance, assemblies:" This was passed on to the Human Resources Department.

24. The accommodation granted the plaintiff by the defendant and its agents was limited to "leave meetings if she feel(s) symptoms of situational stress."

25. This accommodation was found precarious by the plaintiff's physician as this did not prevent the onset of stress conditions.

26. On April 2, 2013, the Plaintiff became unconscious during class due to, according to her physician, situational stress which exacerbated her disability.

27. HRD's response was to direct the Plaintiff to inform her immediate supervisor should such and episode reoccur.

28. The Plaintiff had indeed informed her supervisor at the next possible opportunity.

29. The episode occurred in the evening, the supervisor was informed the following morning.

30. The accommodation offered the plaintiff is discriminatory and unequal.

31. Blanket accommodation waivers have been granted to colleagues: Sarah D'Angelantonio, William Jenisch and Nathan Cervos, regarding the attendance of meetings.

32. On January 16, 2013, the plaintiff informed the Dean, Dr. Kerry McKeever, (henceforth "Dean") and Janette Merideth, Human Resource Director (henceforth "HRD") of cases of accommodations regarding meetings attendance.

33. The defendant and its agents have not offered adequate accommodations.

34. The defendant, Dean and HRD were informed of the physician's warning.

35. The defendant, Dean and HRD have continued to ignore the physician's warning.

36. Violating the plaintiff's right to confidentiality of medical information, the plaintiff's medical information, including the physicians note was disseminated to History professor/Union officer, Douglas Ley, without plaintiff's permission.

37. Douglas Ley stated to the defendant's agent, Dean, that he did not consider the issue within the purview of the RFF/local chapter of the AFT.

38. Douglas Ley stated to the plaintiff that he did not consider the issue within the purview of the Rindge Faculty Federation/local chapter of the American Federation of Teachers that is not within his purview as a union officer.

39. On March 21, 2013, the plaintiff brought to the attention of the defendant, the Dean and HRD that bullying during departmental meetings as a central cause of situational stress during meetings to the Dean and HRD.

40. The Dean off-handedly replied that in the defendant's judgment, body language and mimicry do not constitute bullying.

41. Accommodation of teleconferencing, in which plaintiff calls in to the meeting has led to heightened bullying—reported to plaintiff by colleagues who are present at meetings.

42. The heightened bullying and its damaging effects on the plaintiff have been reported HRD and the Dean.

43. Hostile behavior during faculty meetings has been recorded in the minutes of the Faculty Meetings.

44. The plaintiff was placed on a short term disability leave from September 13, 2011 through December 26, 2011 due to situational stress.

45. Between December 26, 2011 and January 20, 2012, the plaintiff visited a studio/classroom she was scheduled to teach in during the spring semester.

46. Upon inspection, the plaintiff was dismayed to find that essential equipment had been removed.

47. Following numerous enquires the plaintiff learned through witnesses that the equipment had been disposed of by a male colleague, Nathan Sullivan, who had commenced employment in 2010.

48. In service to the University, the plaintiff teaches 15 students in the studio/classroom in question: The colleague who disposed of the equipment allows only 12 students in his class.

49. The plaintiff reported both the absence of the equipment and the hardship and heightened stress that the disposal of this equipment would cause her and her students.

50. When the Division Chair, Dr. Phyllis Zrzavy, reported the plaintiff's concerns that needed equipment was disposed of during her transition from disability leave to active employment, the Dr. Paul Kotila, the Former Dean (henceforth, "Kotila") became agitated and dismissive of the complaint.

51. The absence of this equipment has continued to cause serious inconvenience, hardship, stress and even injury to the plaintiff.

52. Kotila acted with disregard for the plaintiff's disability.

53. In October 2012 the plaintiff applied for and was denied the position of Fine Arts department coordinator.

54. The plaintiff has been employed by the defendant since 1997.

55. The plaintiff is the senior member of the department and completely qualified for this position.

56. The Dean granted the position to a less experienced employee.

57. This decision impacted the plaintiff's work record causing additional stress.

58. In the May 20, 2013 review of the plaintiff's employment performance, the plaintiff's requirement for "more service to the University is pointedly indicated."

59. In February 2013, the plaintiff was the sole volunteer to offer her services to a committee of long trusted colleagues.

60. The plaintiff was expressly and without discussion denied this position due to her disability.


COUNT II


61. The allegations of paragraphs 1 through 60 of this Complaint are incorporated by reference into this paragraph 61.

62. On February 13, 2013, the plaintiff filed a charge ("Charge") with the Equal Employment Opportunity Commission ("EEOC") charging the defendant with discriminating against the plaintiff on the basis of disability.

63. On May 8, 2013, the plaintiff amended the charges ("Charges") with the Equal Employment Opportunity Commission ("EEOC") charging the defendant with discriminating against the plaintiff on the basis of age, sex, retaliation and disability.

64. In October 2012 the plaintiff applied for and was denied the position of Fine Arts department coordinator.

65. The plaintiff is the senior member of the department and completely qualified for this position.

66. The position was granted to a male colleague Nathan Sullivan, born in 1978 is under forty (40) years of age, whose employment at the University commenced in 2010.

67. The plaintiff's employment commenced 1997.

68. In the May 20, 2013 at a review of the plaintiff's employment performance, the plaintiff's requirement for "more service to the University" is pointedly indicated.

69. In 2011, the plaintiff was harshly reprimanded for asking a student to clean up after himself.

70. The student in question accused the plaintiff's son, who is unassociated with the University, of racial harassment.

71. A highly accusatory memo was placed in the plaintiff's personal file by Kotila.

72. On January 28, 2014, Nathan Sullivan, defamed the University by spewing profanities to a classroom of students.

73. The employee subsequently told students to take whatever materials and equipment they wanted.

74. The Dean was informed of the incident by Facilities Director, Douglas Lear.

75. A student witness informed the Dean concerning the incident.

76. The Dean acknowledged the incident.

77. The defendant, the Dean, and HRD were informed that the plaintiff's property was taken.

78. The defendant, the Dean, and HRD ignored knowledge of the employee's actions that precipitated the theft even after being informed which colleague precipitated the theft and loss to the plaintiff.

79. The defendant and its agents have acted to protect Nathan Sullivan, and closed its investigation on April 10, 2014.

80. The Dean referred the plaintiff to Campus Safety for an investigation.

81. The defendant and its agents did not share essential information which it possessed with the Director of Campus Safety, Maureen Sturgis.

82. The treatment of Nathan Sullivan who urges students to steal University property is in stark contrast to the treatment of the plaintiff who asks a student to clean an area of the gym he has left dirty.

83. When on March 27, 2013 the plaintiff identified to the defendant, the Dean and HRD that bullying manifested in mimicry and body language by Nathan Sullivan is a central cause of situational stress during departmental meetings, the defendant off-handedly replied that in the defendant's judgment, body language and mimicry do not constitute bullying.

84. The harsh reprimand in the Kotila 2011 memo states that the plaintiff would face termination for the very behavior that the defendant and its agents have permitted the employee born 1978.

85. The plaintiff has expressly and without discussion been discriminated against due to her age.

COUNT III

86. The allegations of paragraphs 1 through 85 of this Complaint are incorporated by reference into this paragraph 86.

87. On February 13, 2013, the plaintiff filed a charge ("Charge") with the Equal Employment Opportunity Commission ("EEOC") charging the defendant with discriminating against the plaintiff on the basis of disability.

88. On May 8, 2013, the plaintiff amended the charges ("Charges") with the Equal Employment Opportunity Commission ("EEOC") charging the defendant with discriminating against the plaintiff on the basis of age, sex, retaliation and disability.

89. In February 2013, the plaintiff was the sole volunteer, offering her services to a committee consisting of non-hostile colleagues.

90. This position was granted to a male colleague who had not volunteered.

91. In the May 20, 2013 review of the plaintiff's employment performance, the plaintiff's requirement for "more service to the University is pointedly indicated."

92. The Dean justified her decision to deny the plaintiff the committee position with the explanation that the male employee needed more committee work.

93. On March 21, 2013, the plaintiff brought to the attention of the defendant that bullying by MC of the department, during departmental meetings as a central cause of situational stress during meetings to the Dean and HRD.

94. The Dean off-handedly replied that in the defendant's judgment, body language and mimicry do not constitute bullying.

95. When present at departmental meetings, the Dean witnessed the bullying behavior on the part of this male employee and allowed it and its continuance.

96. The plaintiff was expressly and without discussion denied this position due to her gender.

11

COUNT IV

97. The allegations of paragraphs 1 through 96 of this Complaint are incorporated by reference into this paragraph 97.

98. On January 16, 2013, the plaintiff presented a thorough explanation of her disability to the Dean and HRD, including graphic medical images.

99. At the very latest, on January 16, 2013, the University was completely made aware of the plaintiff's disability.

100.     The accommodation granted the plaintiff to "leave meetings if she feel(s) symptoms of situational stress," was found precarious by the plaintiff's physician.

101.     The defendant challenged the plaintiff's objection regarding the precarious nature of this accommodation, ignoring the accommodation's putting the plaintiff in harm's way.

102.     On April 2, 2013, the Plaintiff became unconscious during class due to, according to her physician, situational stress which exacerbated her disability.

103.     HRD's response was to direct the Plaintiff to inform her immediate supervisor should such and episode reoccur.

104.     The Plaintiff had indeed informed her supervisor at the next possible opportunity.

105.     The episode occurred in the evening, the supervisor was informed the following morning.

106.     The defendant ignored the physician's warning regarding the lack of safety of this accommodation.

107.     The defendant rather cavalierly countered by citing the protection of their insurance policies.

108.     By contrast, an employee, who received a waiver to not attend meetings, is given assistance and transportation to and from certain workshops and assemblies.

109.     On March 27, 2013, the plaintiff identified that bullying manifested in mimicry and body language by Nathan Sullivan as a central cause of situational stress during departmental meetings.

110.     The Dean off-handedly replied that in the defendant's judgment, body language does not constitute bullying and would take no steps to remedy this situation.

111.     Remarkably, Nathan Sullivan was appointed to the President's task force to promote civil behavior.

112.     In a further violation of confidentiality and after the plaintiff had charged the defendant through the EEOC with this violation, the defendant disseminated personal and sensitive material to a colleague in its position statement to the colleague's EEOC charge.

113.     The materials consisted of an arbitration ruling involving action against the Plaintiff, and her family, completely unrelated to the colleague's charge.

114.     Following the amendment of the plaintiff's EEOC charge on May 8, 2013, to include retaliation, sex (gender) and age, the defendant escalated its harassment.

115.     The plaintiff has been the University's sole art historian since 1997.

116.     Without her knowledge, and without consulting her, the defendant assigned an art history course to unqualified faculty.

117.    The plaintiff has acted as Director of the University's art gallery since 1998.

118.    The plaintiff has consistently received the highest accolades for her performance
in this capacity.

119.    In an executive summary of the program review of the plaintiff department, the
Dean mandated that the plaintiff produce more "showings" (art exhibitions in the
gallery).

120.    The Dean's executive summary of the program review was distributed within four
months of the plaintiff amendment of her EEOC charge.

121.    Prior to the University received the plaintiff's amended EEOC charge, the Dean
had assessed the plaintiff's performance as Gallery Director laudably.

122.    The "Provost" has embarked on repeated harassment with unwarranted demands
that the plaintiff attend to tasks that were already completed.

123.    This harassment commenced in September 2013: The harassment commenced
regarding the first exhibition following the amendment of the plaintiff EEOC charge.

124.    As a direct and proximate result of Defendants' unlawful and intentional conduct,
Plaintiff has suffered and continues to suffer serious emotional distress, humiliation,
anguish, emotional and physical injuries, all to her damage in amounts to be proven at
trial.


COUNT V

125.    The allegations of paragraphs 1 through 124 of this Complaint are incorporated by
reference into this paragraph 125.


14

126.     The accommodation granted the plaintiff to "leave meetings if she feel(s) symptoms of situational stress," was found precarious by the plaintiff's physician.

127.     The defendant challenged the plaintiff's objection regarding the precarious nature of this accommodation, ignoring the accommodation's putting the plaintiff in harm's way.

128.     On April 2, 2013, the Plaintiff became unconscious during class due to, according to her physician, situational stress which exacerbated her disability.

129.     HRD's response was to direct the Plaintiff to inform her immediate supervisor should such and episode reoccur.

130.     The Plaintiff had indeed informed her supervisor at the next possible opportunity.

131.     The episode occurred in the evening, the supervisor was informed the following morning.

132.     The defendant ignored the physicians warning regarding the lack of safety of this accommodation.

133.     The defendant rather countered by citing the protection of their insurance policies.

134.     By contrast, an employee, who received a waiver to not attend meetings, is given assistance and transportation to and from certain workshops and assemblies.

135.     On March 27, 2013, the plaintiff identified that bullying manifested in mimicry and body language by a male employee as a central cause of situational stress during departmental meetings.

136.     The Dean off-handedly replied that in the defendant's judgment, body language does not constitute bullying and would take no steps to remedy this situation.

137.     Remarkably, the employee was appointment to the President's task force to promote civil behavior.

138.     In a further violation of confidentiality and after the plaintiff had charged the defendant through the EEOC with this violation, the defendant disseminated personal and sensitive material to a colleague in its position statement to the colleague's EEOC charge.

139.     The materials consisted of an arbitration ruling involving action against me, and my family, completely unrelated to the colleague's charge.

140.     Following the amendment of the plaintiff's EEOC charge on May 8, 2013, to include retaliation, sex (gender) and age, the defendant escalated its harassment.

141.     The plaintiff has been the University's sole art historian since 1997.

142.     Without her knowledge, and without consulting her, the defendant assigned and an art history course to unqualified faculty.

143.     The plaintiff has acted as Director of the University's art gallery since 1998.

144.     The plaintiff has consistently received the highest accolades for her performance in this capacity.

145.     In an executive summary of the program review of the plaintiff department, the Dean mandated that the plaintiff produce more "showings" (art exhibitions in the gallery).

146.     The Dean's executive summary of the program review was distributed within four months of the plaintiff amendment of her EEOC charge.

147.     Before the University received the plaintiff's amended EEOC charge, the Dean had assessed the plaintiff's performance as Gallery Director laudably.

148.     Provost, Dr. Kim Mooney (henceforth, "Provost") has embarked on repeated harassment with unwarranted demands that the plaintiff attend to tasks that were already completed.

149.     Such harassment commenced in September 2013: The harassment commenced regarding the first exhibition following the amendment of the plaintiff EEOC charge.

150.     As a direct and proximate result of Defendants' unlawful conduct and negligence, Plaintiff has suffered and continues to suffer serious emotional distress, humiliation, anguish, emotional and exacerbation of her disabilities, ,all to her damage in amounts to be proven at trial.

## COUNT VI

151.     The allegations of paragraphs 1 through 150 of this Complaint are incorporated by reference into this paragraph 151.

152.     Each Defendant had the authority to supervise, prohibit, control, and/or regulate the other Defendants and supervisees so as to prevent these acts and omissions from occurring.

153.     Each Defendant knew, had been directly informed and reasonably should have known that unless they intervened to protect plaintiff and properly to supervise, prohibit, control, and/or regulate the conduct of the other Defendants, those Defendants would perceive their acts and omissions as being ratified and condoned.

154.     Each Defendant failed to exercise due care by failing to supervise, prohibit, control, or regulate the remaining Defendants and supervisees and/or by failing to protect plaintiff.

17

155.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff has

suffered and continued to suffer injuries entitling her to damages in an amount to be

determined at trial.

--------------------------- SUPPLEMENTAL/AMENDED COMPLAINT ------------------------------

Jurisdiction of this Court is invoked pursuant to FMLA 29 U.S.C. § 2614(1)(A)-(B); 29

U.S.C. § 2615(a)(2); Supplemental jurisdiction for N.H. State Law 28 U.S.C. § 1367

### COUNT VII

156. Plaintiff was approved a leave under FMLA from October 22 – December 18, 2014

based on her serious health condition.

157. Plaintiff submitted a return to work authorization form to the Human Resource

office of Franklin Pierce University on December 18th, stating that she would return to work on

December 19, 2014. Plaintiff resumed her duties on December 19th, conducting among other

things an inspection of the gallery space.

158. In an email dated December 21st to Dean McKeever, and colleagues Susan

Silverman and Nathan Sullivan, Plaintiff reported an issue of a possibly missing art work and

reiterated that she returned to work on December 19, 2014.

159. Along with attending to duties, including the gallery, beginning December 19th the

Plaintiff proceeded to accommodate the arrival of the newly appointed University's president by

extending the closing of the then running exhibition.

160. On January 13, 2015, the Plaintiff communicated via email the schedule change to

colleagues whose students' works were in the exhibition.

161. Within 2 hours of the Plaintiff informing colleagues of the exhibition's extension, Plaintiff received word via email from Defendant, Dean McKeever, stating that the Plaintiff was no longer coordinator of the art gallery since that duty now fell to a Fine Arts Faculty member, Nathan Sullivan (male, under 40 years old) who was hired in 2010.

162. Nathan Sullivan, had been appointed as interim gallery coordinator only for the duration of Plaintiff's spring semester 2015 sabbatical leave.

163. In Dean McKeever's first email at 10:09 AM on January 13th, she states that Plaintiff is "not the coordinator of the gallery this semester. That duty falls to Nathan Sullivan, who will determine all aspects of galle[r]y governance..."

164. Dean McKeever's email of January 13, 2015 was the first word from Defendant Dean McKeever that Plaintiff had been relieved from her position as gallery coordinator.

165. Plaintiff informed Dean McKeever at 11:09 AM on January 13th via email that as per the University's posted calendar, the spring semester, and therefore the Plaintiff's sabbatical would not begin until January 19th 2015.

166. Dean McKeever's reply ignored that upon return from FMLA leave Plaintiff had the right and obligation to resume her position and wrote: *"I have not relieved Professor Sullivan of his responsibility for the gallery, which I gave him when you went on leave. He is still responsible for all gallery operations and will continue to be so until at least the end of your sabbatical."* (Emphasis added by Plaintiff.)

167. Dean McKeever had stated to the Plaintiff in a June 30th 2014 email that the decision to continue the position of gallery coordination rested with the Plaintiff.  See ¶192 for quoted email.

168. In less than fifteen minutes of the January 13, 2015 email exchange between the Plaintiff and Dean McKeever, Dean McKeever followed-up with an email she sent to the entire Fine Arts and Graphic Communications Departments at FPU. In this email she stated: *"I wish to clarify that Nathan Sullivan has not been relieved of his responsibilities for managing the FPU gallery. This appointment is effective until at least the end of spring semester 2015. All communication regarding the gallery should be directed to him..."* (Emphasis added by Plaintiff.)

169. By January 14th, the exhibition Plaintiff attempted to extend had been dismantled and any rights due the Plaintiff to resume her position had been made physically impossible.

170. The Plaintiff has been scheduled for a research sabbatical beginning spring semester (January 19th is listed as the commencement of spring semester 2014-2015) focusing on art exhibition practice on college and university campuses and needed this access to the gallery to prepare.

171. The Plaintiff has coordinated/directed Franklin Pierce University's Art Gallery since 1998.

172. During her 1997 interview for the position at Franklin Pierce University, this duty was announced to her by the then Dean, Dr. Richard Weeks and the members of the search committee, as part of her assumed duties.

173. The Plaintiff receives salary and benefits for the gallery coordinator position. The position entails one quarter (1/4) of her contracted duties. (See Articles 10.2.1 and 10.2.2 of the Collective Bargaining Agreement.) As such she teaches 3 rather than 4 courses per semester since her gallery duties equate to the load of a full course.

174. On May 12, 2013, Dean McKeever, wrote the following in Plaintiff's five-year performance review of the Plaintiff, praising the Plaintiff's work in the art gallery: *"I wish to commend especially your work with the gallery. Under sometimes challenging conditions you have continued to provide the university's administrators, faculty, staff and students with well-articulated experiences of the myriads of art..."*

175. Following the summer recess in 2013, and after Plaintiff's amended EEOC complaint, including gender, age discrimination and retaliation, Dean McKeever and Provost Mooney initiated their barrage of extreme micro-management outlined in ¶¶ 176-179, 187-195 above.

176. In October 2013, Dr. Mooney launched both telephone and email inquiries regarding announcements for a gallery exhibition. The announcements had already been sent to the FPU community.

177. In a series of email from April 9-10, 2014, Dean McKeever voiced her dissatisfaction with the announcement of Graphic Communications senior exhibition.  When the Plaintiff explained that a colleague had usurped the announcement task for pedagogical reasons, and the colleague confirmed the truth of this, the micro-managing calmed for the time being.

178.  In September 2013, Dean McKeever, distributed an executive summary of the Fine Arts Department, calling for more exhibitions in the gallery.

179. On October 7, 2013, Plaintiff replied to the Dean's directive with a carefully prepared document comparing the resources and performance of equivalent galleries, which proved that the Plaintiff produced more exhibitions with the least resources than any other academic art gallery in the region.

180. Upon receiving this objective report, the Dean tasked Plaintiff with conducting a program review of the gallery in fall 2015 when Plaintiff would return from sabbatical leave.

181. The job description for gallery coordinator on file in the academic affairs office lists under "expectations," "to possess the ability to work on their own with little direct supervision."

182. The Plaintiff had displayed this ability for over fifteen years.

183. This treatment by Defendant Dean McKeever increased in intensity 28 days after Defendant Dean McKeever had been served a summons on June 2, 2014 for this present case.

184. On June 30, 2014, Dean McKeever initiates with a query regarding a summer gallery schedule, because *"someone had just told [her] that there will be gallery showings this summer…"*

185. As has been standard gallery practice, since 2009, a small exhibition had been installed in the gallery in order to enhance the space during the summer as it is used be administrators.

186. Plaintiff wrote, informing the Dean that the exhibition was officially announced both online and with numerous posters throughout the campus.

187. Continuing this June 30, 2014 exchange, Dean McKeever changes topic, writing: *"This has been mentioned before, but please make sure that well in advance of notification to Lisa Murray, I [Dean McKeever] expect a personal notice to go to Ron Hammond for the President, and to the Provost, as well as myself about any openings."*

188. The campus-wide, online announcement (see ¶186) had been disseminated through Lisa Murray's office. (At that time, Office of Marketing and Communication)

189. Plaintiff had no knowledge of the requirement for personal notification, since it had not been "mentioned" to her.

190. Plaintiff requested a follow-up from Dean McKeever, informing Plaintiff when this requirement had been "mentioned" before. Dean McKeever would never produce an answer.

191. In a fifth email in the June 30, 2014 exchange with the Plaintiff, Dean McKeever conflates gallery procedure (agreed to be included in the fall 2015 program review) and the gallery coordinator job description, (on file at the Dean's Academic Affairs office and to be revised in the program review).

192. Neglecting these distinctions and agreement, the Dean moves to the following warning: "*This last year, I specifically asked for documentation on [g]allery procedures. Because you have not provided me with this documentation, I will consult with the Provost about revisiting the job description requirements this summer [2014] and presenting them to you in the fall.*" "*...you will have the opportunity to review it and accept or reject the position based on the new protocol and job description.*" (During fall semester 2013, Dean McKeever charged Plaintiff with conducting a formal program review of the gallery in fall 2015 (including formalizing gallery policies and revising the present gallery coordinator position description on file in the Dean's academic affairs office)).

193. Realizing the ever increasing convolutions created by Dean McKeever's replies, Plaintiff attempted to address Dean McKeever's request for personal notification to senior staff members by asking about the timeframe guidelines for notification.

194. In an effort to comply with Dean McKeever's request for personal notification, on October 15, 2014 the Plaintiff notified the Dean, Provost and President of an exhibition opening on November 12, 2014.

195. This compliance was answered with the following from Dean McKeever:

*"I do hope that there is more work displayed than there was for the faculty show. It seemed a bit bare in the space or perhaps there may have been a better use of the space that (sic.) overall. On the other hand, I know that you limited the size and quantity or art from the faculty members, and perhaps this needs to be adjusted in the future. I was also surprised that two such large pieces were given to Sally." "I thought that the space might have been used for more pieces by the fine arts and graphics faculty rather than given to a member of the dance faculty."*

196. Dean McKeever's assessment was based on fallacies regarding the submission policy since four faculty had not offered any works at all and one offered only one work.

197. On December 3, 2012, Defendant Dean McKeever, received a note written by Plaintiff's physician, indicating that due to aggravation of physical symptoms due to emotional stress, Plaintiff be restricted from meeting attendance and assemblies.

198. Plaintiff requested an accommodation for her disability.

199. At a January 16, 2013 meeting to discuss the accommodation, Plaintiff showed Dean McKeever a series images from an esophagram from May 23, 2012, graphically revealing that Plaintiff suffers from paraesophageal hiatal hernia.

200. Dean McKeever has received information regarding the Plaintiff's medical conditions, indicating her susceptibility to emotional distress since December 2012.

201. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer serious emotional distress, humiliation, anguish, and an exacerbation of her medical disabilities.

## SUPPLEMENTAL PRAYER FOR RELIEF

As a result of Dean McKeever's retaliatory action to not restore Plaintiff's position as gallery coordinator when Plaintiff returned to work from FMLA leave, Plaintiff seeks the following relief: Written assurance to the Plaintiff that she will have the option of resuming her position as gallery coordination, following her sabbatical; notification to all faculty emailed by the Dean on January 13th correcting information concerning Nathan Sullivan's appointment as gallery coordinator; punitive and compensatory damages due to IIED (Intentional Infliction of Emotional Distress) in an amount to be determined by the court.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Court:

A. Order Defendants to award a monetary disbursement equivalent to the plaintiff's three year rolling contract, including monetary compensation equivalent to Plaintiff's benefits as outlined in the Collective Bargaining Agreement between the University and the Rindge Faculty Federation;

B. Order Defendants to award retirement with the status of Professor Emeritus;

C. Order Defendants to remove the Memo of the February 1, 2011 from the Plaintiff's personal, evaluative file; OR

D. Order Defendants to Redact all references to the Plaintiff's son in both the MEMO of February 1, 2011 and the arbitration ruling of 2012; the Defendant's agreement to the Plaintiff permanently attaching a rebuttal and explanation to the Memo; the attachment of letters extolling the Plaintiff's excellent service to the University, from all defendants involved in the MEMO and the arbitration;

E. Order Defendants to make whole the Plaintiff by providing compensation for expenses and time lost due to the requirements of medical care in relation to situational stress caused by the Defendant;

F. Order Defendants to make whole the Plaintiff by providing compensation for nonpecuniary losses, including emotional pain, suffering, inconvenience, and mental anguish in amounts to be proven at trial;

G. Grant such further relief as the Court deems necessary and proper; and

H. Grant the Plaintiff its costs in this action.


Date: _Jan 22, 2015_          Signature _____
    _(see attachment)_                Lorettann Gascard, pro se
                                      348 Route 202
                                      Rindge, New Hampshire 03461
                                      603-899-5405